IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| JIMMY MOORE AGENCY, INC., ) <br> d/b/a The Moore Agency, and James ) <br> H. Moore, ) <br> ) <br>     Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> ALLSTATE INSURANCE ) <br> COMPANY ) <br> ) <br>     Defendant. ) | CIVIL ACTION NO.: |

## COMPLAINT

Plaintiffs Jimmy Moore Agency, Inc., d/b/a The Moore Agency ("The Moore Agency"), and James H. Moore ("Mr. Moore") state the following as their Complaint against defendant Allstate Insurance Company ("Allstate").

### I.   JURISDICTION AND VENUE

1. This Court has jurisdiction over this action under 28 U.S.C. § 1332. The Moore Agency is an Alabama Corporation and Allstate is an Illinois Corporation. The amount in controversy exceeds $75,000.00

2. James H. Moore, is an individual resident of Jefferson County, Alabama, and is over the age of nineteen (19) years.

1

3. For the purposes of this Complaint, Allstate made the representations stated herein to Mr. Moore and The Moore Agency, and they both relied upon them. As stated, unless otherwise noted, references to Mr. Moore and/or The Moore Agency refer to the two plaintiffs collectively.

4. Venue is proper in this judicial district and division pursuant to 28 U.S.C. § 1391 because this is a judicial district in which a substantial part of the events and omissions giving rise to the claims occurred.

## II.   PARTIES

5. Jimmy Moore Agency, Inc. d/b/a/ The Moore Agency, is an Alabama Corporation with its principal place of business in Jefferson County, Alabama.

6. Allstate Insurance Company ("Allstate"), is an Illinois Corporation headquartered in Northbrook, Illinois. Allstate is an insurance company engaged in selling property and casualty insurance, and other insurance and financial products, throughout the United States, including Alabama. Allstate's insurance products are sold through its authorized insurance agents.

## III.   FACTS

7. In 2004, James H. Moore was approached by Kirk Price, an Allstate Field Sales Leader ("FSL"), about becoming an Allstate insurance agent.

8. After a time of investigation and due diligence, Mr. Moore decided that he would become an Allstate agent. Originally, the business was conducted by an entity named The Moore Agency, LLC. However, in 2011, Jimmy Moore Agency, Inc. d/b/a The Moore Agency was formed to conduct the business of running an Allstate insurance agency in the Edgewood section of Homewood, Alabama.

9. Mr. Moore owned 100% of the stock in The Moore Agency at the time of its incorporation.

10. In 2011, The Moore Agency executed an Exclusive Agency Agreement ("EA Agreement") with Allstate. The EA Agreement is the document that defines the relationship between Allstate and its exclusive agents, and establishes an Allstate insurance agency.

11. It is important to understand how the owners of Allstate insurance agencies are compensated. In particular, it is important to understand the difference in compensation schemes between an established agency and an agency starting from scratch, or acquired with annual premiums revenue of less than $1.5M.

12. An established agency earns, as a one-time payment, on any given property or casualty insurance policy sold, 10% of the annual premium, and then 10% of annually renewed premiums. In other words, in an established agency, or an agency sold to a new owner operating below the $1.5M threshold, the owner

receives 10% of the annual premium for the new business, then 10% upon renewal of that policy.

13. In order to incentivize start-ups, and to make it economically feasible to start an agency, Allstate offers an Agency Development Bonus ("ADB") for new agencies.

14. The ADB bonus is an enhanced bonus structure over the first forty-eight (48) months of the life of a new agency. The ADB program offers a larger percentage of annual premiums for new agencies, which decreases over the life of the program. The amount of the enhancement depends upon two factors: (1) how many months the new agency is into its life; and (2) the percentage the agency achieves of a baseline annual premium amount established by Allstate.

15. For example, in 2016, a new agency meeting 225% of a baseline number of insurance products (items) sold, would get, in addition to the standard 10% for a new item, plus 10% of the annual premium, a bonus of 33% of the annual premium earned on each item sold, so long as over twenty-seven (27) items were sold in its first month of operation. The bonus is payable if the agency is at 150% of the baseline, or 90% of the baseline, but at lesser amounts.

16. The number of items required to be sold to meet the ABD threshold at the 225% threshhold increases for the first year up to fifty-nine (59) for the twelfth

month, and then stabilizes at 68 items for month 13 – 48. The same pattern of progression happens at the 150% and 90% levels.

17. As the months go on, the ADB bonus percentage decreases, down to 1%, and 0% at the different levels at the 48th month, at which point it is expected that agencies can operate at the standard 10%/10% commission structure.

18. Mr. Moore, through his corporation, was successful at running Allstate insurance agencies, and between 2004 and 2014, was granted other Allstate agencies, which he established, made profitable; and then sold. Mr. Moore, through his company would then do the same thing again.

19. In May of 2014, The Moore Agency was operating two Allstate insurance agencies through EA Agreements. One was located in the Edgewood section of Homewood, Alabama, and the other on Beacon Parkway in Homewood, Alabama.

20. Mr. Moore's skill at building insurance agencies did not go un-noticed by Allstate. In October of 2014, Ken Needham, the Territory Sales Leader ("TSL") for the State of Alabama, approached Mr. Moore and asked him if he had interest in becoming a Field Sales Leader ("FSL") for Jefferson County, Alabama. An FSL provides support and supervision to insurance agencies in a geographic territory, and reports up the chain of command to the TSL, which usually covers a state.

21. Mr. Moore enjoyed, and was good at, getting agencies off of the ground, so he told Mr. Needham that he would consider the offer. At that time, Mr. Moore would consider the offer, but would have to weigh this offer against his current status running two locations (Allstate agencies) of The Moore Agency.

22. While he was considering this offer, Mr. Moore was told by Mr. Needham that the FSL position was at a salary of $102,000.00, per year, plus eligibility for a bonus based upon the performance of existing agencies within the area and, more importantly, the ability of Mr. Moore to recruit new agents, and for those new agents to establish new agencies.

23. In making his pitch to Mr. Moore as to why he should take the FSL position, Mr. Needham told Mr. Moore that the best thing about this offer was that he would have his FSL position and salary <u>and</u> he would be able to keep one of his agencies, the Beacon Parkway agency.

24. In late October or early November of 2014, Mr. Moore decided that he would accept Allstate's offer, and become the FSL for Jefferson County, Alabama.

25. Mr. Moore Accepted this offer based upon the representations of Mr. Needham stated above. In the course of researching this opportunity, Mr. Moore contacted another Allstate agent who had taken a job "in-house" as an Allstate FSL, a man named Rusty Prewett, who had become the Allstate FSL for an area

based in Lee County, Alabama.  Mr. Moore asked Mr. Prewett if it was true that he could keep an agency, and be an Allstate FSL.  Mr. Prewett told him that this was true, and that all he had to do was transfer the agency to a family member.

26.    Mr. Moore asked Ken Needham if he could transfer the Beacon Parkway agency to his wife, Brittni Moore, and Mr. Needham told him that he could.  Mr. Needham further told him that when the agency was transferred to Brittni, it would be treated as the opening of a new agency, and the ADB bonus program for the Beacon Parkway location of The Moore Agency would begin anew when the agency was transferred to Brittni.

27.    Based upon Mr. Needham's representations, The Moore Agency sold the Edgewood location for $300,000.00, and Mr. Moore accepted Allstate's offer to become a FSL, while keeping the Beacon Parkway agency, but with a change in the ownership of The Moore Agency.

28.    Mr. Moore told Mr. Needham that he would transfer the Beacon Parkway agency to Brittni, and they were well aware that she had no experience in running an insurance agency, and did not hold the necessary licenses to do so.

29.    Mr. Moore was told by Mr. Needham that this was fine, and all he needed to do was to appoint a "key person", which is an Allstate contractual term, to hold the license and be responsible for the day-to-day operation of the agency.

30. Mr. Moore wanted Allan Smith, who was already an agent at the Beacon Parkway location to operate as the key person. However, Mr. Moore knew that it took lengthy training to become a key person in an Allstate insurance agency, and that Allstate wanted the transfer to happen on January 1, 2015. In November of 2014, Mr. Moore was told that Mr. Smith could operate as the key person for the Beacon Parkway location, and that Allstate would waive a number of the normal training requirements to become a key person so that Mr. Smith could take n that role on January 1, 2015.

31. Additionally, Mr. Moore was told that in order to take the FSL position, he had to pass the FINRA Series 26 and 51 exams Allstate required of the position. Mr. Moore spent a good deal of time in November and December of 2014, studying to take and pass the exams, which he eventually did.

32. In order to establish a new agency, a potential Allstate agent has to prepare for submission and approval by Allstate what is known as an EA Opportunity Tool ("EAOT"). This is essentially a business plan for the new agency. Because the transfer of the agency to Brittni was to be treated as a new agency, The Moore Agency, largely through the effort of Mr. Moore, prepared for approval an EAOT for The Moore Agency to operate at the Beacon Parkway location.

33. The EAOT was prepared in early November of 2014, and had three important characteristics for the purposes of this case.

   a. The EAOT disclosed the transfer of 100% of the stock of The Moore Agency from Mr. Moore to Mrs. Moore.

   b. The EAOT listed Allan Smith as the key person responsible for the operation of the agency.

   c. The business plan and modeling and projection in the EAOT were done with the ADB program in place for the transferred agency from January 1, 2015, so that the forty-eight (45) months of the program would continue through December 21, 2019.

34. On or about November 15, 2014, Mr. Moore was told by Ken Needham that the EAOT had been approved as submitted, with the above referenced features, and that they were on target to have Brittni as the owner of The Moore Agency at Beacon Parkway on January 1, 2015, with Mr. Smith operating as the key person and that Mr. Moore could begin taking on FSL duties. Mr. Moore began receiving his FSL salary from Allstate in January of 2015.

35. Between January and April of 2015, all seemed to be going according to plan. Mr. Moore was performing the FSL duties, and The Moore Agency, guided by Mr. Smith, operated under the ADB model, and was paid commissions according to that enhanced schedule. Mr. Moore was

primarily performing his FSL duties, but he was spending some time helping along the business at the Beacon Parkway location.

36.     This changed in May of 2015.  Upon receipt of the Allstate Statement of Commissions in the first two weeks of May, 2015, The Moore Agency began to understand that Allstate was no longer honoring its agreement and business plan to start a new ADB period in January of 2015.  Instead, the ADB period was calculated as if it began with the establishment of the Beacon Parkway office in May of 2014.   This resulted in lower enhancements than in the EAOT, and in a shorter enhancement period.

37.     In July or August of 2015, Chad Solomon, the FSL for the Beacon Parkway location, called Mr. Moore and told him that he had received information from the controller's office in Atlanta that The Moore Agency would have to pay back portions of the ADB compensation for January through April of 2015.

38.     In August of 2015, Mr. Moore immediately called Ken Needham to ask why this happened because it was contrary to the business plan submitted and approved by Allstate.   he brought this to the attention of Ken Needham.  Mr. Needham told him not to worry, and that it would get taken

care of, and the data would be adjusted to reflect the EAOT submitted for the agency owned by Brittni.

39. At about this same time, it became necessary to terminate Mr. Smith for poor performance.

40. Through 2015, The Moore Agency faltered, and Mr. Moore had to infuse it with cash to keep it running. At the same time, in part due to the pressures from having the Beacon Parkway agency underperform due to Allstate not honoring it agreement, Mr. Moore became dissatisfied with the FSL role.

41. In March of 2016, Kevin Kimberly, the Allstate FSL for the Beacon Parkway agency, informed Mr. Moore that there was a problem. He told Mr. Moore that there was a conflict of interest between Mr. Moore's FSL duties and his interest in The Moore Agency. This was the first Mr. Moore had heard of such a "conflict". In fact, he had been told that it was perfectly fine to transfer the Beacon Parkway agency to Brittni. This was one of the inducements to get Mr. Moore to take the FSL job. After a discussion, Mr. Moore thought he had a solution, he would take The Moore Agency back over. Kevin Kimberly told Mr. Moore that this could work because, since he was out of the agency for more than twelve months, he would be

considered a new owner, and a new EAOT could be submitted with Mr. Moore as the new owner. Mr. Moore was told "That's the beauty" of the new ownership solution, it would be considered a new agency.

42. Despite having missed out on the proper commission calculation from April, 2015, to the end of 2015, Mr. Moore thought he could make the agency profitable. He submitted the new EAOT, with the new period beginning in May of 2016, and just as before, he submitted the documentation showing a new ADB period starting in May of 2016.

43. The business plan within the EAOT was approved showing the new ADB period starting in May of 2016.

44. On May 1, 2016, Mr. Moore began running the Beacon Parkway location again as its key person. However, by July of 2016, Mr. Moore realized that his commissions were wrong, at least according to his submitted and approved EAOT. The commissions were wrong because the ADB period was set at May of 2014, not the May, 2016 date he had been promised, and not even the January 1, 2015 date agreed to when the business was transferred to Brittni Moore.

45. As a result, the business was again in financial difficulty. Mr. Moore eventually sold the agency to John Carlton, for $250,000.00, far less than it would have been worth had the ADB plan date been in place as represented.

46. The Moore Agency suffered the following damages.

   a. A loss in earned commissions on the difference in the amounts under the ADB plan calculated from may, 2014, as opposed to January 1, 2015, on commissions earned between January 1, 2015, and May 1, 2016.

   b. A loss in earned commissions in the difference in the amounts under the ADB plan calculated from May 2014, as opposed to May of 2016, for commissions earned between May of 2016, and the date of the sale on April 1, 2017.

## COUNT I
**(Breach of Contract by The Moore Agency)**

47. Plaintiffs incorporate by reference, as if fully set forth herein, paragraphs 1 through 42 above.

48. The Moore Agency and Allstate formed a contract effective January 1, 2015, in which the ADB program would begin anew on January 1, 2015.

49. The EAOT that The Moore Agency submitted to Allstate in October or November of 2014, contained the required business plan. That plan encompassed the beginning of a new ADB period to begin in January of 2015, and was part of the contract between the parties.

50. Allstate breached this contract, beginning in May of 2015, by not honoring the business plan it approved, and readjusting the ADB period for The Moore Agency to begin in May of 2014.

51. This pattern repeated itself in 2016. Prior to May of 2016, Mr. Moore submitted an EAOT showing a new ADB period beginning in May of 2016. This became part of the contract between the parties.

52. Allstate breached this contract by paying the ADB bonus commissions as if the agency was established in May of 2014.

53. This breach caused The Moore Agency damages in that the commissions earned in an ADB period beginning in January, 2015, or May, 2016, were higher than those beginning in May of 2014, and the ADB period would have extended for a longer period of time. This damaged The Moore Agency in two ways: (1) ADB program commissions paid were lower, resulting in commissions of greater than $75,000.00 not being paid to The Moore Agency; and (2) the shorter ADB period made The Moore Agency less valuable when it was sold.

WHEREFORE, Plaintiffs demand judgment in an amount to be determined by struck jury, in excess of $75,000.00.

## COUNT II
### (Fraud on behalf of Mr. Moore and The Moore Agency)

54. Plaintiffs incorporate by reference, as if fully set forth herein, paragraphs 1 through 53 above.

55. Allstate, through its agent and employee, Ken Needham, represented in late October or early November of 2014, that The Moore Agency could be transferred to Brittini, and that the transfer of the agency would be treated as the opening of a new agency, with a new ADB bonus program period beginning in January of 2015.

56. This representation was not true, as, after April of 2015, Allstate paid commissions based upon an ADB period beginning in May of 2016.

57. The Moore Agency, and Mr. Moore, relied upon this representation in taking Ms. Moore out of the key person role, transferring 100% of the stock from James Moore to Brittini Moore, and losing the leadership of Mr. Moore because he relied upon these representation to take the FSL job.

58. The Moore Agency and Mr. Moore were damaged in that they lost significant revenue by: (a) the difference in commissions between an ADB period beginning in May of 2014 versus January of 2015, and (b) the loss of revenue as the result of not having Mr. Moore running the business, as he had a track record of success.

59. Allstate further defrauded Plaintiffs in late October or early December when it accepted the EAOT plan submitted by The Moore Agency showing a new ADB period beginning in January 2015.

60. Allstate's approval of that plan, communicated to Mr. Moore by Mr. Needham, was false. At the time, Allstate knew it was not going to follow through on its promise, by the approval of the EAOT with the new ADB period commencing in January of 2015, that The Moore Agency would be paid the EAOT bonus program according to a January 1, 2015, start date.

61. Allstate revealed its plan until May of 2015, when it changed The Moore Agency's ADB plan bonus payments.

62. The Moore Agency would never have given up its key employee in 2015, without the representation that a new ADB period would begin in January of 2015, and that it could continue as an agency with Mr. Moore in the FSL position, and Brittni owning 100% of the stock. Similarly, Mr. Moore would have never left the agency and taken the FSL position without these representations.

63. In May of 2016, Mr. Kimberly revealed that Allstate considered this a conflict. If this was a conflict, Allstate knew it was a conflict at the time it told Mr. Moore that he could take the FSL job, and that Brittni could be the

100% owner of the stock of The Moore Agency, and appoint a new key person to run the day to day operations of the business.

64. The Moore Agency was damaged in that it lost its key employee, Mr. Moore, and did not receive the commissions it was promised.

65. This patter repeated itself in April of 2016.

66. Mr. Moore was told that he could go back to running The Moore Agency, and that the ADB period would begin in May of 2016.

67. Again, Mr. Moore and The Moore Agency submitted EAOT paperwork showing a new ADB bonus start date of May 1, 2016.

68. Again, Mr. Moore and The Moore Agency relied upon this representation in taking back over the agency, and in pouring capital into getting the agency back on its feet.

69. Again, Allstate refused to honor its representations made by Mr. Kimberly in March or April 1, of 2016, and in its approval of The Moore Agency's April, 2016 EAOT.

70. Again, The Moore Agency was damaged because Allstate calculated the EAOT as running from May of 2014. This caused the commission sto be lower, costing revenue.

71. Moreover, Mr. Moore was damaged in that the price he sold the business for was lower than it would have been with an ADB bonus start date of 2016.

WHEREFORE, Plaintiffs demand judgment in an amount to be determined by struck jury, in excess of $75,000.00

**PLAINTIFFS DEMAND TRIAL BY STRUCK JURY ON ALL ISSUES TO TRIABLE**.

Respectfully submitted,

 /s/ Brian M. Clark
Dennis G. Pantazis
dgp@wigginschilds.com
Brian M. Clark
bclark@wigginschilds.com

*Attorneys for Plaintiffs*

**OF COUNSEL:**
WIGGINS CHILDS PANTAZIS
FISHER GOLDFARB LLC
The Kress Building
301 Nineteenth Street North
Birmingham, Alabama 35203
(205) 314-0500- T
(205) 254-1500- F

**Serve Defendant via certified mail**:
**Allstate Insurance Company
c/o Registered Agent C T Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104**